## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THEO M. and M. M.,<br><br>     Plaintiffs,<br><br>v.<br><br>BEACON HEALTH OPTIONS and the CHEVRON CORPORATION MENTAL HEALTH AND SUBSTANCE ABUSE PLAN,<br><br>     Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00364-JNP-DBP<br><br>District Judge Jill N. Parrish<br><br>Chief Magistrate Judge Dustin B. Pead |

This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and advances two separate causes of action: (1) recovery of benefits under 29 U.S.C. § 1132(a)(1)(B) ("benefit denial claim") and (2) violation of the Mental Health Parity and Addiction Equity Act under 29 U.S.C. § 1132(a)(3) ("Parity Act claim").

Before the court are cross-motions for summary judgment brought by Plaintiffs, Theo M. and M.M., and Defendants, Chevron Corporation Mental Health and Substance Abuse Plan ("Chevron") and Beacon Health Options ("BHO"). ECF No. 52, 55. The court held a hearing to decide these motions on September 22, 2022. At the conclusion of that hearing, the court took the motions under advisement. After considering the written and oral arguments presented by the parties, the court GRANTS Plaintiffs' motion for summary judgment, in part, and DENIES Defendants' motion for summary judgment.

## BACKGROUND

This dispute involves the denial of benefits allegedly owed to Plaintiffs under their ERISA employee group health benefit plan sponsored and administrated by Chevron ("the Plan"). BHO, an entity formed through the merger of ValueOptions and Beacon Health Strategies, is the Plan's claims administrator. When a Plan participant files a claim under the Plan, BHO "reviews the claim and makes a decision to either approve or deny the claim (in whole or part)." (Rec. 53). At all times relevant to this action, Theo M. was a Plan participant and his son, M.M., was a Plan beneficiary. ECF No. 55 at 3. As of Plaintiffs' briefing on January 28, 2022, Theo M. was still a Plan participant and M.M. was still a Plan beneficiary. ECF No. 56.

Plaintiffs sought care for M.M.'s mental health condition at two residential treatment centers ("RTC"). First, M.M. received treatment at Aspiro Adventures ("Aspiro") from May 26, 2015, to August 5, 2015. (Rec. 1649). Subsequently, M.M. transferred to Daniels Academy ("Daniels"), where he received additional care from August 6, 2015, to May 19, 2017. (Rec. 1707). BHO denied coverage for both periods of treatment.

## I.   THE PLAN

The Plan offers benefits for medically necessary mental health and/or substance abuse care at an RTC, (Rec. 9), and classifies residential treatment as a subacute level of care. (Rec. 2202). Specifically, it defines residential treatment as "24-hour residential care" that "provides structured mental health or substance abuse treatment" for "patients who don't require acute care services or 24-hour nursing care." *Id*. The subacute care provided by RTCs contrasts with "acute inpatient treatment," which the Plan recognizes as a higher level of care for mental health and substance abuse conditions. *Id*. In general, the Plan excludes coverage for "services that aren't considered medically necessary." (Rec. 51). The Plan defines medically necessary services as those:

2

- Intended to prevent, diagnose, correct, cure, alleviate or preclude deterioration of a diagnosable condition (ICD-9 or DSM-IV) that threatens life, causes pain or suffering or results from illness or infirmity.
- Expected to improve an individual's condition or level of functioning.
- Individualized, specific and consistent with symptoms and diagnosis and not in excess of patient's needs.
- Essential and consistent with nationally accepted standard clinical evidence generally recognized by mental health or substance abuse care professionals or publications.
- Reflective of a level of service that is safe, where no equally effective, more conservative and less costly treatment is available.
- Not primarily intended for the convenience of the recipient, caretaker or provider.
- No more intensive or restrictive than necessary to balance safety, effectiveness and efficiency.
- Not a substitute for non-treatment services addressing environmental factors.

(Rec. 568). Additionally, "even though a clinician may prescribe, order, recommend or approve a service or supply, it doesn't mean that it's medically necessary. [BHO] . . . determines if a service or supply is medically necessary." *Id*.

BHO uses two separate sets of medical necessity criteria to make benefits decisions for RTC treatment—those for admission and those for continuing care.

BHO's *admissions* criteria for RTC treatment requires claimants to meet *all* of the following requirements:

(1) DSM or corresponding ICD diagnosis and must have mood, thought, or behavior disorder of such severity that there would be a danger to self or others if treated at a less restrictive level of care.
(2) Member has sufficient cognitive capacity to respond to active acute and time limited psychological treatment and intervention.
(3) Severe deficit in ability to perform self-care activity is present (i.e. self-neglect with inability to provide for self at lower level of care).
(4) Member has only poor to fair community supports sufficient to maintain him/her within the community with treatment at a lower level of care.
(5) Member requires a time limited period for stabilization and community reintegration.
(6) When appropriate, family/guardian/caregiver agree to participate actively in treatment as a condition of admission.
(7) Member's behavior or symptoms, as evidenced by the initial assessment and treatment plan, are likely to respond to or are responding to active treatment.

(8) Severe comorbid substance use disorder is present that must be controlled (e.g., abstinence necessary) to achieve stabilization of primary psychiatric disorder.[1]

(Rec. 1860-61). If a claimant meets *any* of the following additional criteria, this is sufficient to deny coverage for admission to an RTC:

(1) The individual exhibits severe suicidal, homicidal or acute mood symptoms/thought disorder, which requires a more intensive level of care.
(2) The individual does not voluntarily consent to admission or treatment.
(3) The individual can be safely maintained and effectively treated at a less intensive level of care.
(4) The individual has medical conditions or impairments that would prevent beneficial utilization of services, or is not stabilized on medications.
(5) The primary problem is social, legal, and economic (i.e. housing, family, conflict, etc.), or one of physical health without a concurrent major psychiatric episode meeting criteria for this level of care, or admission is being used as an alternative to incarceration.

*Id.*

BHO's *continued care* criteria for RTC treatment requires claimants to meet *all* of the following requirements:

(1) Member continues to meet admission criteria;
(2) Another less restrictive level of care would not be adequate to provide needed containment and administer care.
(3) Member is experiencing symptoms of such intensity that if discharged, would likely be readmitted;
(4) Treatment is still necessary to reduce symptoms and improve functioning so member may be treated in a less restrictive level of care.
(5) There is evidence of progress towards resolution of the symptoms causing a barrier to treatment continuing in a less restrictive level of care;
(6) Medication assessment has been completed when appropriate and medication trials have been initiated or ruled out.
(7) Member's progress is monitored regularly and the treatment plan modified, if the member is not making progress toward a set of clearly defined and measurable goals.
(8) Family/guardian/caregiver is participating in treatment as clinically indicated and appropriate or engagement is underway.
(9) There must be evidence of coordination of care and active discharge planning to:
    (a) transition the member to a less intensive level of care;

---

[1] Criteria #8 must only be met "when applicable." (Rec. 565).

4

> (b) operationalize how treatment gains will be transferred to subsequent level of
> care.

*Id*. These internal continued care guidelines further provide that discharge from a residential

treatment center is warranted when:

> (1) Member no longer meets admission criteria and/or meets criteria for another
> level of care, more or less intensive.
> (2) Member or parent/guardian withdraws consent for treatment and the member
> does not meet criteria for involuntary/mandated treatment.
> (3) Member does not appear to be participating in the treatment plan.
> (4) Member is not making progress toward goals, nor is there expectation of any
> progress.
> (5) Member's individual treatment plan and goals have been met.
> (6) Member's support system is in agreement with the aftercare treatment plan.

*Id*.

## II.   M.M.'S CONDITION

M.M. was born by C-Section in 1999. (Rec. 1589). While meeting most of his early

developmental milestones, M.M. suffered from severe separation anxiety as a young child. (Rec.

1590, 1609). M.M.'s separation anxiety improved around the time he turned four years old, but he

continued to experience anxiety symptoms as he aged. (Rec. 1609, 1590). In first grade, M.M.

began struggling in school. Despite receiving "vision therapy, occupational therapy, and

psychotherapy" between first and fourth grades, M.M. fell behind his classmates academically.

(Rec. 1611). In fifth grade, M.M. was placed on an Individualized Education Plan ("IEP"), but this

failed to improve his educational outcomes. "[M.M.] just became more dysfunctional . . . . The

IEP was ineffective." *Id*.

At around this time, M.M. was diagnosed with attention-deficit/hyperactivity disorder

("ADHD") and began taking ADHD medication. (Rec. 1590). M.M. was also prescribed Celexa

to manage his anxiety and developing depression symptoms. *Id*. Unfortunately, these treatments

proved ineffective. M.M. continued to struggle, and at school his social life was "just falling apart."

(Rec. 1611). By seventh grade, M.M. was "being bullied viciously, both physically and verbally." *Id*. Moreover, M.M. experienced an adverse reaction to his ADHD medication that deepened his depression and increased his suicidal ideation, ultimately leading him to "put a rope around his neck," (Rec. 1490), in an attempt to kill himself "by hanging from a bunkbed." (Rec. 316). That year, M.M.'s parents transferred their son to a private school due to his poor academic performance and experience with bullying. (Rec 1611). Despite his new environment, M.M. did not improve academically, and he was forced to repeat seventh grade via home-schooling. *Id*.

M.M.'s home-schooling was "designed to help improve [M.M.'s] fitness, to allow more one-on-one attention to complete work, [to] build his self-esteem," and to teach him "healthier eating habits." *Id*. Due in part to his strong bond with a family au pair, this strategy initially seemed to produce positive results. (Rec. 2599). But M.M. deteriorated once more when his parents discovered that the au pair had introduced M.M. to cigarettes and marijuana. *Id*. M.M.'s parents immediately dismissed the au pair, prompting M.M. to revert back to all of his "poor behaviors" and descend further into crisis. *Id*.

M.M.'s experience with marijuana soon developed into a dangerous drug habit. M.M. began experimenting with cocaine, mushrooms, LSD, and methamphetamines that he purchased from homeless individuals using money he had earned from a part-time job and money he had allegedly stolen. (Rec. 2599, 234, 2238). While M.M. has stayed clean from drugs for extended periods of time, he never stopped drinking alcohol and smoking cigarettes. (Rec. 234). M.M.'s parents were forced to lock up all the alcohol in their home or else M.M. would steal it. *Id*. And even when M.M.'s parents denied their son access to cigarettes, he went on walks to search for discarded cigarette butts that he could smoke off the street. *Id*.

In 2014, when M.M. was around 14 years old, his parents discovered that their son had begun to experiment with cutting himself. (Rec. 1590). M.M. was prescribed Seroquel to reduce these impulses, but this medication "resulted in rapid weight gain." *Id.*[2] M.M. reacted to the changes in his body by searching online for "ways to rapidly lose weight" and soon began binging and purging "several times a week." (Rec. 1595). "What started as an innocent investigation of how to lose weight, quickly combined with [M.M.'s] rigid thinking and need for control," producing a dangerous eating disorder. *Id.*

On April 15, 2014, Dr. Alice M. Gates, Ed.D., diagnosed M.M. with Asperger's type Autism Spectrum Disorder, ADHD, Persistent Depressive Disorder, Generalized Anxiety Disorder, and Bulimia Nervosa. (Rec. 1596). She noted that M.M. was

> anxious and depressed and has difficulty with attention and concentration. [M.M.] has daily anger outbursts and finds it difficult to sustain close peer relationships. His family is frustrated and exhausted by his out of control behavior. He is currently being homeschooled because of being severely bullied and failing to participate in school. [M.M.] has considerable difficulty with age-appropriate communication, self-regulation, peer socialization, social/emotional reciprocity, behavioral rigidity, sensory sensitivity, and executive functioning.

(Rec. 1595). Dr. Gates recommended that M.M. "receive individual therapy to help him manage his depression, anxiety, and anger, as well as his eating disorder." *Id.*

Following these diagnoses, M.M. did receive additional outpatient treatment. (Rec. 1607). Still, his condition declined even further. *Id.* In eighth grade, M.M. began exhibiting violent and aggressive behavior. While M.M. never physically harmed any individuals outside of his household, he regularly lashed out against family members, eventually becoming "so aggressive at home that his mother and sister had to leave the house." (Rec. 1590). When M.M. did not receive

---

[2] A different psychiatric evaluation attributes M.M.'s weight gain to a Abilify—a similar drug. (Rec. 1637). Regardless, there is no dispute that a medication prescribed to reduce suicidal urges contributed to M.M.'s weight gain.

what he wanted at any given moment, he "[threw] significant temper tantrums by yelling, being verbally abusive, and at times, smashing non-valuable objects outside." (Rec. 1607). M.M. often postured as though he was going to smash his parents' cars, *Id.*, and generally caused enough destruction that his parents were forced to remove most of the furniture from his room. (Rec. 359).

During one incident, sparked when M.M. ingested six Adderall pills, M.M. threw a pair of scissors at his sister and threatened his family with a screwdriver and hammer. *Id*. This episode was only resolved when M.M.'s mother forced her son to go to an emergency room after she discovered that he had penned a suicide note. *Id*. M.M. was ultimately hospitalized for three days, and his parents began supervising him nearly constantly. (Rec. 8).

On July 14, 2015, after M.M.'s admission to Aspiro, Dr. Stephanie L. Tonin, Ph.D., concluded that M.M. had been on a "downward spiral for about the past three years but things [had] intensified over the past year despite his parents' efforts to provide him with outpatient support and treatment, school help, and increased structure to his daily life." (Rec. 1607). She noted that:

> M.M. lacks accountability, struggles to 'connect the dots' between his poor choices and the consequences, has been easily losing his temper, is argumentative at home, defiant, and blaming others. He has completely withdrawn from his family and spends almost all of his time alone in his room. Only making things worse is that he has also been abusing drugs (cannabis and methamphetamine) and alcohol for the past one to two years. He has also struggled markedly in his socialization and has been very isolated from peers.

*Id*.

Dr. Tonin also observed that M.M. lacked even the simplest ability to take care of himself and his surroundings. "M.M.'s self-care and basic hygiene have been very poor and his person, room, and bathroom were described as being incredibly dirty." (Rec. 1608). M.M. had "stopped purging," but he had "been binge eating regularly for the past eight months and . . . gained 60

pounds in that time period. His parents described that he will eat anything, even things from the pantry and freezer that require cooking but that he ingests as is." *Id.* The evidence indicates that by the spring of 2015, M.M.'s parents were struggling to manage their son's mental health conditions.

### III.    M.M's Treatment and Denial of Benefits

On May 26, 2015, M.M. was admitted to Aspiro as a result of his escalating symptoms and because outpatient care had failed to produce significant positive health outcomes. Once enrolled, M.M. received approximately nine weeks of outdoor behavioral health care. (Rec. 5, 27). Aspiro is a licensed treatment program providing sub-acute inpatient treatment to adolescents with mental health, behavioral, or substance abuse disorders. (Rec. 5).

M.M.'s parents claimed benefits under the Plan for their son's treatment at Aspiro on March 10, 2016. (Rec. 62-64). Specifically, they requested post-service, retrospective review. Their claim came relatively late—nearly a year after M.M. was admitted. *Id*. BHO reviewed the services provided by Aspiro to determine whether to grant M.M.'s claim and ultimately sent a letter denying coverage on March 24, 2016. *Id*. This initial denial letter explained that BHO had determined that RTC services were not medically necessary for M.M. *Id*. It offered the following clinical rationale:

> You are a 15 year old male requesting admission to mental health residential treatment program staring on 05/26/2015. Based on clinical information submitted, you have been diagnosed with autism spectrum disorder and you are described as highly functional. Your thinking is described as rigid with a poor frustration tolerance and you are not aggressive or assaultive. There are no thoughts of self-harm or harm to others. In addition, your living environment consists of supportive parents.

(Rec. 62). Because of these clinical characteristics, BHO believed that M.M. "did not require admission to residential treatment with 24 hours supervision" and "could have been effectively treated in outpatient level of care." *Id*. It also claimed that its reasoning was based "on [BHO]'s

Medical Necessity Criteria for Residential Treatment Services, [enclosed] and the terms of [the] plan as outlined in the Summary Plan Description (SPD)." *Id*.

On September 19, 2016, Plaintiffs requested a level one appeal of their denial. (Rec. 119-39). In their appeal, Plaintiffs provided Beacon with a brief summary of M.M.'s personal and medical history, along with his medical records, and various psychological evaluations up to that date. (Rec. 126-33). They also provided BHO with two letters from M.M.'s treating professionals, which argued that it was medically necessary for M.M. to receive care from Aspiro. (Rec. 132-33). BHO assigned the appeal to a new reviewing physician who upheld the initial denial. This reviewer wrote Plaintiffs to explain BHO's new reasoning:

> You are a 15 year old male, requesting residential treatment services from 05/26/2015 to 08/05/2016 for treatment due to emotional and behavioral issues. Your symptoms included issues controlling your anger, taking care of your hygiene, and difficulties understanding and coping with issues. You have a history of using marijuana, alcohol, meth, cocaine. You were described as anxious, depressed, with ideas of self-harm without plans. You were treated with medications: Citalopram 20 mg daily. As of 05/26/2015, the information provided did not support medical necessity for your condition to be manage in this residential. Although medical necessity appears to have been met for 24 hour services at the mental health residential level of care, the selected out of network facility does not appear to provide intense enough therapeutic programming to meet your needs—the facility does not include active medical oversight. Based on Beacon's medical necessity criteria the services provided would not qualify as a mental health residential treatment program.

(Rec. 66). Unlike the initial denial letter, which argued that RTC treatment was not medically necessary, this new denial reasoned that Aspiro did not have the ability to sufficiently provide the high level of treatment required for M.M.'s severe mental health needs.

On November 21, 2016, Plaintiffs requested a level two appeal of their denial. (Rec. 524-31). BHO assigned the appeal to yet another reviewing physician, who, on December 20, 2016, upheld the claim administrator's initial decision. (Rec. 39). This reviewer wrote Plaintiffs to explain BHO's reasoning:

10

You are a 15-year-old male requesting admission to a mental health residential treatment program starting 5/26/15 to address your difficulty with social interactions, inflexible thinking, and difficulty tolerating frustration. As of 05/26/2015 you are calm, cooperative, and courteous. You are not aggressive, thinking is clear, organized, and goal directed and you have no thought or intent to harm yourself or others. There are no serious medical symptoms and you have a home and a supportive family. As of 05/26/2015, treatment at a residential mental health program is not medically necessary and you can safely receive mental health treatment services at the outpatient level of care.

(Rec. 70). Like the first reviewer, this physician believed that RTC treatment was not medically necessary.

On August, 6, 2015, immediately following his discharge from Aspiro, M.M. was admitted to Daniels. (Rec. 1707). M.M. spent nearly 22 months at Daniels, completing treatment on May 19, 2017. (Rec. 5). Daniels is a licensed treatment program, providing sub-acute inpatient care to adolescents with mental health, behavioral, or substance abuse disorders. *Id*. It specializes in treating individuals on the autism spectrum. *Id*. M.M. was transferred to Daniels at the advice of Dr. Tonin after she evaluated M.M. during his treatment at Aspiro. (Rec. 1627). Dr. Tonin recommended that M.M. "transfer to a live-in treatment environment such as a therapeutic boarding school or residential treatment program." *Id*. Doing so was necessary because M.M.'s "emotional and behavioral issues [had] intensified." *Id*.

At Daniels, treating professionals regularly interacted with M.M. and produced reports detailing his progress and ongoing struggles. One psychoeducational assessment, dated January 26, 2016, noted that while M.M. was showing signs of improvement, he was still struggling with his mental health. (Rec. 1645-75). Specifically, the report claimed that "[M.M.] is at a high risk of substance abuse relapse," (Rec. 1672), that on one home visit from Daniels, M.M. "became emotionally overwrought and locked himself into his closet, refused to come out, and wept

uncontrollably for hours," (Rec. 1652), and that M.M. needed to "continue his work at Daniels" in order to rebuild his relationship with his family. (Rec. 1654).

On October 5, 2015, Plaintiffs contacted ValueOptions, a BHO precursor entity, to submit a claim for M.M.'s time at Daniels. (Rec. 5, 1712). ValueOptions responded on October 23, 2015 and denied coverage for this treatment. (Rec. 1756). It argued that M.M.'s care was not medically necessary and that Daniels, based on the information available, did not qualify as an RTC program. *Id*. The letter denying coverage explained:

> You are a 15 year old male, admitted to a mental health residential treatment program on 08/06/2015 for treatment of behaviors primarily due to your Autism Spectrum diagnosis, but also included ADD, inattentive presentation, persistent depressive disorder with a history of bulimia, cannabis use, alcohol use, and other illegal substances. Based on the clinical information received on 09/23/15 and additional information on 10/07/15; you were experiencing mild thoughts suicidal and homicidal ideation only. You were in touch with reality and you did not have severe medical problems. You have supportive parents and your medication adjustments could have been managed by an outpatient psychiatrist. While increased treatment was needed, there is not enough evidence to support the need for 24 hour monitoring. In addition, Autism is not a covered benefit, however in reviewing for medical necessity based on the secondary diagnosis, at time of admit on 08/06/2015, you did not require treatment in mental health residential treatment. The facility's treatment plan is also not appropriate, in that the services provided would not qualify as an RTC program, based on our medical necessity criteria. Based on reported information, you could have safely accessed a less restrictive level of care with outpatient providers to include individual therapy and treatment with an outpatient psychiatrist 2-3x/week in addition to family therapy 2x/week.

(Rec. 1756).

On March 22, 2016, Plaintiffs appealed this denial of coverage with BHO, the new claims administrator. (Rec. 1779-97). Along with this appeal, Plaintiffs sent M.M.'s medical records, several letters supporting a claim of medical necessity, and a description of M.M.'s history and treatment plan. (Rec. 1343-1697). A BHO physician reviewer examined this documentation and denied Plaintiffs' appeal on April 12, 2016. (Rec. 1763). This reviewer reasoned that:

You are a 15 year old male admitted to a mental health residential treatment program on 08/06/2015, due to anger and aggressive behavior. Based on clinical information received, you are not having active thoughts, plans, or intent to harm yourself or others. There is no evidence that [you] have any medical problems and you have been compliant with treatment and medications. Additionally, your living environment consists of supportive parents and you show no aggression towards peers or staff. Autism is not a covered benefit, however in reviewing for medical necessity based on the secondary diagnoses, you do not require treatment in a mental health residential treatment [program]. Also, the services provided at Daniels Academy do not qualify as a residential treatment program, based on our medical necessity criteria. As of 08/06/2015, your symptoms did not require 24 hour treatment in a residential treatment setting. You could have safely been treated in an intensive outpatient program, which meets for 3 to 5 days per week for several hours per day, along with family therapy and treatment with an outpatient psychiatrist.

*Id.*

On July 11, 2016, Plaintiffs requested a second appeal of BHO's denial of coverage for M.M.'s treatment at Daniels. (Rec. 1195). Yet another physician reviewer denied this appeal on August 2, 2016, explaining:

You are a 15 year old male admitted to a mental health residential program on 08/06/2015 to treat your history of verbal aggression, oppositional behavior, substance use, depression, anxiety, and binge eating. Based on clinical information, there is no information provided which validates that you are physically aggressive, unable or willing to comply with authority, or actively using substances. There is no serious eating disturbance, and no intent or plan for harm to self or others. Additionally, there is no report of any psychiatric impairment or being unable to provide for your self-care needs. As of 08/06/2016, it is not possible to validate medical necessity for residential treatment. You can safely be treated at the mental health outpatient level of care.

(Rec. 1767).

Having exhausted all prelitigation appeal obligations, Plaintiffs filed this ERISA action on May 24, 2019.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." However, when both parties move for summary judgment in an ERISA proceeding focusing on a benefit denial claim, the parties have effectively "stipulated that no trial is necessary" and thus "summary judgment is merely a vehicle for deciding the case." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (citation omitted). In these instances, "the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *Id.* (citation omitted).

Unlike a benefit denial claim, the court affords no special deference in interpreting the Parity Act because the interpretation of a statute is a legal question. *See Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1258 (D. Utah 2016) (citing *Foster v. PPG Indus. Inc.*, 693 F.3d 1226, 1233 (10th Cir. 2012)). Thus, when examining a Parity Act claim on a motion for summary judgment, the court will "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## ANALYSIS

The parties' cross-motions for summary judgment present two main issues for analysis. The court begins by examining Plaintiffs' claim for denial of benefits at Aspiro and Daniels. It then turns to Plaintiffs' Parity Act claim.

## I.   DENIAL OF BENEFITS CLAIM

### A.  Standard of Review for Denial of Benefits Claim

The court must first determine the proper standard of review to apply to its evaluation of Plaintiffs' denial of benefits claims. It finds that arbitrary and capricious review is appropriate.

A plan administrator's denial of ERISA benefits is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If a plan vests such discretionary authority in the plan administrator, a reviewing court will instead apply "a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious." *Weber v. GE Grp. Life Assurance Co*., 541 F.3d 1002, 1010 (10th Cir. 2008) (citations omitted). Additionally, a health plan administrator with discretionary authority may delegate its discretion to a third party. *Geddes v. United Staffing Alliance Employee Medical Plan*, 469 F.3d 919, 926 (10th Cir. 2006). Denial decisions made by a third party with delegated discretion are also reviewed under an arbitrary or capricious standard. *Id*. at 926-27.

Here, Plaintiffs do not contest that the Plan explicitly grants Chevron discretionary authority to determine eligibility for benefits and construe the terms of the plan. ECF 55 at 23. Plaintiffs also do not dispute that Chevron maintained the right to delegate its discretionary authority to a third party and designated BHO as the Plan's claims administrator. ECF 55 at 23. As such, the court will apply an arbitrary and capricious standard of review to Plaintiffs' denial of benefits claims.

"Under arbitrary and capricious review, this court upholds [the administrator's] determination so long as it was made on a reasoned basis and supported by substantial evidence." *Van Steen v. Life Ins. Co. of N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018). The court "need not determine that the [administrator's] interpretation was the only logical one, nor even the best one. Instead, the decision will be upheld unless it is not grounded [on] any reasonable basis*." Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007) (citations and internal quotation marks omitted), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). However, "the arbitrary and capricious standard of review is

15

not without meaning." *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697, 705 (10th Cir. 2018) (unpublished).[3] The administrator's decision must be "based upon the record as a whole," *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002) (citations, internal quotation marks, and alterations omitted), "must take into account whatever in the record fairly detracts from its weight," *id*, and must be supported by substantial evidence, which requires "more than a scintilla of evidence that a reasonable mind could accept as sufficient to support a conclusion." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1134 (10th Cir. 2011) (citation and internal quotation marks omitted). "Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary." *Caldwell*, 287 F.3d at 1282 (citation omitted).

Additionally, "ERISA imposes 'a special standard of care upon a plan administrator.'" *McMillan*, 746 F. App'x at 705 (quoting by *Metro. Life Ins. Co.*, 554 U.S. at 115). The administrator, acting in the role of a fiduciary, "must discharge its duties with respect to the discretionary claims decisions solely in the interest of the participants and beneficiaries of the plan . . . and, consistent with this standard of care, must provide a full and fair review of claim denials." *Raymond M. v. Beacon Health Options Inc.*, 463 F. Supp. 3d 1250, 1266 (D. Utah 2020).

### B. Arbitrary and Capricious Denial of Plan Benefits

Plaintiffs' motion for summary judgment makes two arguments as to why the claim administrator's denial of benefits was arbitrary and capricious. At their heart, both seek to show that the reasoning in Defendants' denial letters was not sufficiently supported by substantial evidence and that their conclusions were not reached through full and fair review. First, Plaintiffs

---

[3] Although unpublished, McMillan is a heavily cited case by trial courts in the District of Utah. *See, e.g.*, *Kerry W. v. Anthem Blue Cross & Blue Shield*, 444 F. Supp. 3d 1305, 1312 (D. Utah 2020).

claim that Defendants abused their discretion by failing to apply the terms of the Plan to M.M.'s specific medical history. Second, they argue that Defendants abused their discretion by disregarding the opinions of M.M.'s treating professionals.

### 1) Application of Terms to M.M.'s Specific Medical History

The Department of Labor's ERISA regulations instruct claims administrators to offer "specific reason[s]" for denials of benefits that "apply . . . the terms of the plan to the claimant's medical circumstances." 29 C.F.R. § 2560.503-1(g)(1)(i), (v). Courts in the District of Utah have consistently held that insurers do not meet this requirement when their denial letters contain "neither citations to the medical record nor references to the report by [a plaintiff's] doctors." *D.K. v. United Behavioral Health*, No. 2:17-CV-01328-DAK, 2021 WL 2554109, *10 (D. Utah June 22, 2021) (internal quotation marks omitted, citing *Raymond M.*, 463 F. Supp. 3d at 1282). Moreover, claim administrators must cite "factual findings to support their conclusions about [a Plaintiff's] mental health." *Kerry W.*, 444 F. Supp. 3d at 1313. It is not enough for a reviewer to simply "gather and examine relevant evidence." *Id*. Instead, they must respond to "diagnoses and reports" offered by claimants with "more than conclusory statements[,] such as '[y]ou could have been treated with outpatient services,' or 'you no longer need 24 hour structured care.'" *Id*. They must also offer factual support for statements like "'you are not positively participating in the program' or 'you are no longer harming yourself [and] you are able to control your behavior.'" *Id*. Courts in the District of Utah draw these interpretations of ERISA from the Tenth Circuit's decision in *McMillan v. AT&T Umbrella Benefit Plan No. 1*, which held that "ERISA imposes a special standard of care upon a plan administrator." 746 Fed. App'x at 705. This standard requires an administrator to "discharge its duties . . . solely in the interests of the participants and

beneficiaries of the plan" and "provide a full and fair review of claim denials." *Id*. Those denials that do not meet the *McMillan* standard of care inevitably fail arbitrary and capricious review.

Plaintiffs argue that that Defendants' denials of benefits do not meet the *McMillan* standard because BHO failed to cite and jointly analyze *specific* provisions of the Plan and *specific* facts in M.M.'s medical records. Essentially, they contend that all of BHO's findings were conclusory. Because Plaintiffs' claim is based on the absence of evidence of analysis in Defendants' letters, the best way to proceed is by examining the evidence and arguments Defendants present to show that they complied with ERISA's requirements. The court, thus, examines each of Defendants' four main reasons they believe BHO's letters were not conclusory. Ultimately, it rejects each reason, finding that Defendants' arguments are too weak to overcome even arbitrary and capricious review.

First, Defendants maintain that their decisions meet the standard outlined above because each of their denial letters referenced clinical information received from Plaintiff. As evidence, Defendants cite their initial denial letter for treatment at Daniels, dated October 23, 2015. (Rec. 1756) This letter states that its findings were "[b]ased on the clinical information received on 09/23/15 and additional information on 10/07/15." *Id*. Defendants claim that this passage, which refers to all of the documents submitted by Plaintiffs, shows that they provided M.M.'s family with the information they needed to understand which clinical records and facts BHO relied upon in reaching its reasoned conclusion. Defendants also point to another passage in same the letter where a reviewing physician claims that "[y]ou were in touch with reality and you did not have severe medical problems. You have supportive parents and your medication adjustments could have been managed by an outpatient psychiatrist." Defendants argue that this text clearly shows a reviewer using factual findings to determine that M.M. did not require RTC treatment.

The court holds that these two examples do not meet Defendants' burden under ERISA. Defendants first quote is suspect because more than a mere citation to *all* of claimant's submitted documents is required for full and fair review. Such a broad reference provides Plaintiffs with almost no information about which *specific* facts Defendants are using to support their claims. A cite to every record is essentially just as useful to a claimant as a cite to no record at all. For a court to endorse this practice would fly in the face of the purpose of ERISA, which is to call for "a meaningful dialogue between ERISA plan administrators and their beneficiaries." *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 635 (10th Cir. 2003). At oral argument, Defendants clarified that representatives from Daniels also called the claims administrator to explain M.M.'s care at their facility. Defendants note that they did not cite these communications in their denial letter, so their letter limited the universe of potential facts considered in the decision. But the fact that phone calls are not included in the list of cited evidence does little to assist Plaintiffs in knowing why their claims were denied. It remains the case that Defendants' citation to all documents does not meet the court's standards for meaningful dialogue.

Moreover, Defendants second quote describing M.M. is also suspect. The reviewing physician's "factual findings" are materially similar to the statements Judge Benson previously cited as "conclusory" in *Kerry*. 444 F. Supp. 3d at 1313 ("You could have been treated with outpatient services," "you no longer need 24 hour structured care," "you are not positively participating in the program," and "you are no longer harming yourself [and] you are able to control your behavior."). BHO offered no factual support for the proposition that M.M. was "in touch with reality," "did not have severe medical problems," and "has supportive parents," even though reaching these conclusions requires fact intensive analysis. (Rec. 25). Even if the court were to grant that these statements about M.M. are indisputably true, the denial letter's statement

that M.M.'s "medication adjustments could have been managed by an outpatient psychiatrist" is undoubtedly conclusory given the staggering amount of evidence in M.M.'s records showing that his medications were failing to improve his condition and producing significant side effects, including an eating disorder and suicidal thoughts. *Id*. (Rec. 1490).

Beyond the two passages above, Defendants provide no other examples of BHO's application of the Plan's terms and clinical criteria to M.M.'s medical history. The court independently searched for additional reasoned analysis in BHO's denial letters but discovered little evidence that could assist Defendants' argument. In fact, the only denial letter that seems to cite concrete facts or references the opinions of M.M.'s treating was BHO's September 30, 2016 response to level one appeal of its Aspiro denial, which concluded that because M.M had "a history of using marijuana, alcohol, meth, cocaine" and was "described [by his treating doctors] as anxious, depressed, with ideas of self-harm without plans," he needed *more intense* care than the treatment an RTC could offer. (Rec. 66) In short, the only denial letter that comes close to ERISA's standards for reasoned conclusions contradicts BHO's ultimate rationale for denying coverage for inpatient treatment and acknowledges that M.M. needed residential care. BHO can receive no credit for this reasoning, which it outright rejects in its subsequent appeal denial. (Rec. 70).

Defendants attempt to brush these problems under the rug by stating that the vague and contradictory nature of their denial letters are inconsequential so long as they *generally informed* Plaintiffs that M.M.'s requested treatment was not medically necessary. Citing *James C. v. Anthem Blue Cross Blue Shield*, they argue that even when "the timeline of . . . letters, and the reasons for denial contained therein, is jumbled" and "varied," so long as it is clear that a plaintiff was on notice that his treatment was not necessary, a claims administrator has done enough to prevail at summary judgment. No. 2:19-CV-38, 2021 WL 2532905 at *13 & *9 (D. Utah June 21, 2021).

The court disagrees with this analysis because Defendants misstate the holding from *James C*. In the passage Defendants cite, Judge Waddoups was not deciding whether the letters at issue were arbitrary or capricious, rather he was deciding whether the letters contained procedural irregularities that entitled plaintiffs to *de novo* review of their claims. *Id*. In the case before this court, whether plaintiffs deserve *de novo* review is not in dispute. Thus, *James C.* is a red herring. Defendants need to do more than simply tell claimants that they believe RTC treatment is not medically necessary; non-conclusory reasoning is required to back up their claims.

Second, the court turns to Defendants' argument that if Plaintiffs do not provide the court with sufficient evidence to prove that RTC treatment was medically necessary, then it does not matter if BHO's analysis did not comport with ERISA's procedural requirements. They point out that "Plaintiffs' motion relies almost exclusively on dated clinical information not relevant to the requested benefits as opposed to the clinic records from Aspiro and Daniels Academy." ECF No. 60 at 25. More specifically, Defendants argue that Plaintiffs did not reference any of the medical records pertaining to M.M.'s time at Aspiro or Daniels in their briefs. In fact, they claim the only record Plaintiffs cite to support the medical necessity of treatment at Daniels is from January 2016, which was 16 months before M.M.'s discharge from Daniels. *Id*.

But the absence of facts to prove medical necessity in Plaintiffs' briefing is beside the point. Defendants cannot establish the premise of their argument—that Plaintiffs must prove that M.M.'s RTC treatment was medically necessary to win a motion for summary judgment. To set out the proper burden of proof in this dispute, Defendants mistakenly cite *Mary D. v. Anthem Blue Cross Blue Shield*, an unpublished case. 778 F. App'x 580, 595 (10th Cir. 2019). The passage they highlight explains Plaintiffs' burden in an ERISA case where a Plaintiff is attempting to fully reverse a denial of benefits under *de novo* review. *See id*. at 592. While *Mary D.* does raise

Plaintiffs' burden of proof in that specific situation, it does not give Defendants a blank check to completely disregard ERISA's procedural requirements in all cases. Here, Plaintiffs are not focused on reversal, they primarily seek to prove enough to have BHO's denials remanded for further review.[4] Thus, the *Mary D.* standard of review does not apply and Plaintiffs can still prevail on their motion for summary judgment without showing medical necessity.

Additionally, *Rasenack*, a precedential Tenth Circuit opinion cited by *Mary D*, directly contradicts Defendants' interpretation of the burden of proof in ERISA cases. *Rasenack v. AIG Life Ins. Co.*, 585 F.3d 1311 (10th Cir. 2009). *Rasenack* holds that "although the insured ultimately carries the burden of showing he is entitled to benefits, the plan administrator has a fiduciary duty to the insured to conduct an investigation and to seek out the information necessary for a fair and accurate assessment of the claim." *Id*. at 1324. In other words, if the plan administrator cannot show that it conducted a reasonable and well communicated investigation, a court can find its conduct arbitrary and capricious regardless of the facts on the record. Here, the court does not need to decide whether Defendants' denial was reasonable given the full record, rather it must simply find that Defendant did not adequately communicate the reasoned conclusions of its investigation.

Third, Defendants attempt to buttress BHO's denial letters by searching M.M.'s medical records for evidence that treatment at Aspiro and Daniels was not necessary. They brief the court on details that were previously lacking from denial letters with the goal of supporting BHO's unsupported conclusions. Specifically, Defendants contend that M.M.'s admission to Aspiro was unnecessary because:

---

[4] As discussed later, while Plaintiffs argue that the court should reverse their denial instead of remanding the case for further consideration, they do not attempt to prove their case on *de novo* review or by showing that Defendants' decision was unreasonable. Rather, they attempt to avoid remand by asking the court to accept novel legal arguments.

- "Records reflect that M. is a high functioning individual who was not using illegal substances at the time of admission." ECF No. 52 at 18 (citing (Rec. 29)).

- "One physician reviewer critically noted that the 'focus appears to be on patient's ability to get along with his peers and [to] be able to negotiate transitions without undue anxiety.'" ECF No. 52 at 18-19 (citing (Rec. 29)).

- "[T]he progress note reports state that M. is 'calm, cooperative, courteous. He has no behavioral problems.'" ECF No. 52 at 19 (citing (Rec. 39)).

- "[T] the clinical records are replete with such notes during M.'s time at Aspiro:

    o '[M.'s] affect was content. [M.] and this therapist reviewed progress towards treatment goals, peer interactions, academics, communication with home, therapeutic assignments, and [M.'s] overall week. . . . He identified a plan for going home as opposed to boarding school and was willing to be flexible with change.' (Rec. 416).

    o '[M.'s] affect was content. . . . [M.] reported on his ability to demonstrate leadership this week. [M.] was able to lead by example and improved in his ability to be a leader during group transitions.' (Rec. 423).

    o '[M.'s] affect was content. . . . [M.] reported that he 'loved skills camp' and that he had a good week.' (Rec. 398).

    o '[M.] was courteous and willing to answer questions.' (Rec. 461)."

ECF No. 52 at 19 (citations modified for clarity). Defendants similarly contend that M.M.'s treatment at Daniels was unnecessary because:

- "The records reflect that M. was able to live independently, work part-time, and excel in high school." ECF No. 52 at 21 (citing (Rec. 1228)).

- "[T]he clinical records from M.'s treatment at Daniels Academy include the following:

  o '[M.] will benefit from continued involvement with an individual therapist.' (Rec. 388).

  o 'Staff report: He's in a good place, an interesting place. But he can be manipulative. Able to maintain a steady mood. No anger or aggressive. His demonstrating skills, not being defensive. Apologized to a peer.' (Rec. 1177).

  o '[M.] shared his enthusiasm about his job and this is nice for the other guys to see. They are respectful of him in his leadership.' (Rec. 1267).

  o '[M.] has earned several privileges recently after working very hard to meet requirements to get there. Therapist engaged [M.] in discussing these new changes in order to help him assess how he is doing with new freedoms and how he can continue to demonstrate mature and solid behavior which will allow him to keep his privileges.' (Rec. 1270).

  o '[M.] is feeling very confident right now and spoke well about how his new job was going.' (Rec. 1272)."

ECF No. 52 at 21-22 (citations modified for clarity).

While these quotes and summaries of findings include facts that Defendant could have marshaled to rationally conclude that RTC care for M.M. was not medically necessary, they arrive too late to impact the outcome of this motion for summary judgment. The court may "consider only 'those rationales that were specifically articulated in the administrative record as the basis for denying a claim.'" *Spradley v. Owens-Illinois Hourly Emps. Welfare Ben. Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012) (citing *Flinders*, 491 F.3d at 1190). "The reason for this rule is apparent," courts should "not permit ERISA claimants denied the timely and specific explanation to which

the law entitles them to be sandbagged by after-the-fact plan interpretations devised for purposes of litigation." *Id*. (citing *Flinders* 491 F.3d at 1191). "A plan administrator may not 'treat the administrative process as a trial run and offer a post hoc rationale in district court." *Id*. at 1140-41 (citing *Flinders* 491 F.3d at 1192). BHO presented few of the facts above in any of their letters. For instance, none of M.M.'s denials for treatment at Daniels referenced the fact that he "was able to live independently, work part-time, and excel in high school." ECF No. 52 at 21. Yet, Defendants attempt to inject this new rationale for rejecting M.M.'s claim. Accordingly, the court disregards all of the new reasons for denial of benefits in Defendants' briefing and declines to let BHO expand the existing denial rationales in their letters.

Fourth, Defendants argue that BHO's letters to Plaintiffs were not arbitrary and capricious because external reviewers agreed with their decisions to deny benefits. The court rejects this argument. The record shows that on June 1, 2017, AllMed, an external reviewer, agreed with BHO's denial of RTC treatment at Aspiro for lack of medical necessity. (Rec. 76-80). Similarly, on January 1, 2017, a different external reviewer, MCMC, found that M.M.'s RTC treatment at Daniels was not medically necessary. (Rec. 1773-77). These independent analyses do not persuade the court that BHO's denials were adequate because Defendants do not cite a single ERISA opinion where a court has relied on an external reviewer's conclusions to support summary judgment. This court has previously held that, at most, "[w]hile it is true that an external reviewer's approval of the plan administrator's benefits determination can provide some indicia that the administrator's determination was reasonable, the administrator's determination must stand on its own" *David P. v. United Healthcare Ins. Co.*, 564 F. Supp. 3d 1100, 1122 (D. Utah 2021). The rationales provided in the six BHO letters "must independently demonstrate that [BHO's] final benefits determination was not arbitrary and capricious." *Id*. Here, they do not.

Ultimately, even "[i]f the reviewers' conclusions were based on 'substantial evidence,' no such evidence is cited in the explanations [Defendant] sent to Plaintiffs. The rationales offered by the reviewers fail to adequately explain their conclusions, and [BHO's] denial of coverage was therefore arbitrary and capricious." *Kerry W.*, 444 F.Supp.3d at 1313.

### 2) *Disregard of M.M.'s Treating Professionals*

The court next turns to Plaintiffs' claim that BHO's denials were arbitrary and capricious because it disregarded the opinions of M.M.'s treating professionals. It finds that that since BHO failed to engage with any of M.M.'s doctors or therapists, Defendants' decisions fail to pass muster.

"Nothing in [ERISA] itself ... suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does [ERISA] impose a heightened burden of explanation on administrators when rejecting a treating physician's opinion." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). However, "administrators . . . may not arbitrarily refuse to credit [a] claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834. Specifically, "fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory." *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004).

Plaintiffs contend that Defendants breached these principles. They argue that during the denial appeal process they submitted two letters by treating professionals recommending RTC care for M.M. and that Defendants failed to engage with either. ECF No. 55 at 26 (citing Rec. 174-80,

1675-1681).[5] Additionally, the court identified several other relevant recommendations by treating professionals that Defendants essentially ignored. (*See e.g.*, Rec. 254-261, 357-362).

As an initial matter, the court finds that BHO recognized the *existence* of Plaintiffs' treating professionals' recommendations in their denial letters. Most of BHO's communications contained a brief reference to "the information provided," (Rec. 66), "clinical information submitted," (Rec. 62), "clinical information received," (Rec. 1756), in their clinical rationale for denial. In all denial letters, BHO also noted that its decisions were "[b]ased on an understanding of the information provided" by the claimants. *See, e.g.*, (Rec. 66). Moreover, at each level of appeal, BHO's reviewing physicians stated that their analysis accounted for "any additional information received in support of your appeal." *See, e.g.*, *id*. These acknowledgments are pro forma and lack specificity, but this court has previously ruled that similar declarations are enough to indicate that a claims administrator did not fail to acknowledge treating professionals' recommendations and opinions. *David P.*, 564 F.Supp.3d at 1118. Still, acknowledgement of evidence alone is not enough to prevail on a motion for summary judgment. "[W]hether Defendants engaged with those opinions is an entirely separate question." *Id*.

Here, the evidence demonstrates that BHO reviewers did not engage with the opinions of M.M.'s treating professionals. The court non-exhaustively recounts several statements by M.M.'s treating professionals and subsequently explains how Defendants failed to properly respond.

First, on January 24, 2015,[6] John W. Price, MA, LPC penned a letter stating that "it is of a medical need that this individual receive treatment in a more structured and controlled environment

---

[5] Plaintiffs also cite to "Dr. Corelli's" evaluation of M.M., but they fail to provide a citation and the court was unable to locate it in the 3,418 page record.

[6] The dating of Price's letter is unclear. The letter itself states that it was signed on January 24, 2015, but it also speaks in the past tense when referring to the fact that M.M.'s treatment with Price concluded during April of 2015. The letter also states that M.M. should remain in an RTC even

than his home setting has to offer." (Rec. 175). Price reasoned that M.M. was "prone to exhibiting aggressive, drug seeking and oppositional behaviors," and that he would not be able to "manage his emotional life, discern social cues and cultivate healthy coping mechanisms" in an inpatient setting. (Rec. 175-76).

Similarly, on July 14, 2015, Dr. Stephanie L. Tonin, Ph.D., a licensed psychologist, produced a letter summarizing her recent comprehensive psychological evaluation of M.M. (Rec. 178-80). In this letter, Dr. Tonin stated that:

> [M.M.] should remain at Aspiro until he finishes the program there, and should then transfer to a live-in treatment environment such as a therapeutic boarding school or residential treatment program. This is essential given that his emotional and behavioral issues have intensified and have not been manageable in an outpatient setting despite many years of attempting to manage and address his problems while living at home. Also, he has been putting himself in incredible risky situations in which he could very well be victimized and he is a young man who is rather naïve and emotionally immature; this too points towards the need for him to be in a supervised environment until he can demonstrate healthier problems solving and decision making skills.

(Rec. 179). Dr. Tonin also maintained that "it is strongly recommended [M.M.] now be provided the intervention of a highly structured and supervised separate treatment and learning environment in a residential setting in order to get his adolescent development back on track." (Rec. 180).

Next, on September 9, 2015, Dr. P. Soni, M.D., a board-certified psychiatrist, authored a psychiatric evaluation of M.M. (Rec. 254-61). In this report, Dr. Soni stated that over time, M.M.,

> developed . . . anxiety features, including difficulty with transitions and rigid behaviors. He also had symptoms of ADHD. He had difficulty completing work, daydreamed, did not meet his potential, and was a class clown. His sense of humor and his interests were rather morbid, resulting in social ostracism and bullying. This, in turn, led to more depressive features and his eventual drug use. He has

---

though M.M. was not in an RTC as of January 2015. These facts indicate that the dating of this letter is incorrect. Regardless, it is clear that Price provided reasoning based in fact to support his contention that M.M. needed to remain in an RTC.

experimented with several drugs and seems more interested in an altered state of being rather than a particular drug. He still reports craving that state.

(Rec. 258). Dr. Soni diagnoses M.M. with Autism, ADHD, Disruptive Mood Dysregulation Disorder, Bing-Eating Disorder, Learning Disorder in Mathematics, and Polysubstance Drug Use Disorder. (Rec. 260) As such, Dr. Soni recommended medication for M.M., and advised that M.M. should "[c]ontinue with therapy as provided by Daniels Academy, including individual therapy, family therapy, mileu therapy, and group therapy." (Rec. 261).

Finally, on January 26, 2016, just a few months before M.M.'s discharge from Daniels, Sherry Burke, Ed.D, a licensed therapist, produced a psychoeducational assessment of M.M. (Rec. 1645-74). Burke's report indicated that while M.M. had made progress at Daniels and was now ready to live with his family again, he was still struggling. She believed that M.M. was "at a high risk of substance abuse relapse" and "[a]s he transition[ed] back into his home environment, he w[ould] need supports . . . to sustain sobriety." (Rec. 1672). Additionally, Burke still saw evidence of "aggression, depression, and distorted thinking," (Rec. 1659) and contended that M.M. lacked "the ability to self-regulate emotions and demonstrates cognitive inflexibility." *Id*. Ultimately, she observed many of the same characteristics that led other treating professionals to recommend M.M. spend time at Aspiro and Daniels, but still concluded that Daniels produced positive results for M.M. (Rec. 1653). Moreover, Burke's report extensively quotes Freyja Miller, a licensed therapist and M.M.'s primary therapist at Daniels. *Id*. In the report, Miller recommends that "Mikey continue his work at Daniels . . . He needs to continue to work on re-building relationships with his parents and begin showing an ability to have longer and longer home passes, where parents report that they are comfortable with his behavior." (Rec. 1654).

Defendants' denial letters do not adequately engage with the foregoing opinions. In fact, none of their letters reference any specific statements in favor of treatment by any of the

aforementioned professionals. Below, the court reviews two of the main issues with which BHO failed to engage.

First, BHO's denials often avoided one of the more alarming aspects of M.M.'s behavior—his persistent abuse of substances ranging from alcohol to meth. *See e.g.* (Rec. 62, 70, 1763). John Price was particularly concerned about this behavioral issue. He noted that M.M. "was hospitalized for drug use related symptoms, and since has only recently demonstrated movement in a positive direction within a residential setting." (Rec. 176). None of BHO's letters engage with the fact that M.M. was hospitalized due to drug use and that he struggled to manage his sobriety outside of an RTC. Moreover, the few denial letters that do mention M.M.'s drug use tend to downplay M.M. condition by simply stating that he has a "history of" substance abuse. *See, e.g.* (Rec. 66). Universally, they fail to acknowledge or grapple with the fact that M.M. has a diagnosed substance abuse disorder rather than a slightly unhealthy habit.

Second, every BHO denial fails to account for Dr. Tonin's observation that M.M. "has been putting himself in incredible risky situations" that could result in significant harm if he were to continue to live outside of an RTC. (Rec. 179). Each letter assumes that M.M. is little danger to himself or others and offers no evidence to support such a finding. Even despite the fact that multiple treatment providers believed that M.M. was aggressive, *see, e.g.*, (Rec. 175, 1659), and the fact that M.M. had destroyed furniture and threatened family members with a hammer, (Rec. 359), multiple denial letters stated that M.M. was not aggressive in the least. *See, e.g.*, (Rec. 62, 70, 1767). While these denial letters could have justified their unlikely conclusions using evidence from the record, none of them provided any explanation for their disagreement with M.M.'s treating professionals. (Rec. 175).

Defendants attempt to push back against Plaintiffs' arguments by asserting that Plaintiffs offered no evidence that any treating physician opinion supported two years of RTC treatment. They also argue that one piece of medical evidence, Aspiro's discharge summary, assumed that M.M. would not be transferred to Daniels and that he would instead immediately transition to living at home. *See* (Rec. 136-37). These contentions are not enough for Defendant to prevail on arbitrary and capricious review. While Defendants offer reasons why BHO's decision had reasonable bases in the record, they do not answer Plaintiffs' core argument that BHO failed to properly communicate their decisions in denial letters prior to the start of litigation.

Ultimately, claims administrators do not need to give special deference to the opinions of M.M.'s treating professionals, but they are not entitled to "shut their eyes to readily available information." *Gaither*, 394 F.3d at 807. Nor are they allowed to "cherry-pick[] the information contained in the Record" to justify their decisions. *Rasenack*, 585 F.3d at 1326. As such, the court holds that Defendants abused their discretion by failing to properly engage with M.M.'s treating professionals' opinions.

## II.   PARITY ACT CLAIMS

Plaintiffs additionally claim that Defendants violated the Parity Act by placing treatment limitations on coverage for mental health conditions that are not placed on medical and surgical conditions. The Parity Act makes it unlawful for plans that provide "both medical and surgical benefits and mental health or substance use disorder benefits" to contain mental health treatment limitations that are "more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage)" or contain mental health treatment limitations "that are applicable only with respect to mental health or substance use disorder benefits." 29 U.S.C. § 1185a(a)(3)(A). Defendants deny that they violated the Parity

Act, arguing that Plaintiffs did not produce evidence that BHO applied restrictions to treatment of mental health and substance abuse conditions that are not applicable to medical and surgical conditions.

Before the court decides whether Defendants have violated the Parity Act, it must determine whether its remand of Plaintiffs' benefits claims renders the issue moot. In *David P.*, this court ruled that when a denial of benefits decision is either remanded or reversed, the court will decline to hear Parity Act arguments. 564 F. Supp. 3d at 1123. Plaintiffs push back on this precedent by pointing out that because M.M. and Theo M. are still covered under the Plan, and Beacon still administers it, Plaintiffs may be entitled to remedies to protect them from future violations of the Act. The court disagrees with Plaintiffs. Under Article III, it is not within this court's power to decide potential controversies that rest upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Thomas v. Union Carbide Agricultural Products Co.*, 473 U. S. 568, 580-581 (1985). We have no way of knowing that M.M. will need RTC care in the future, let alone that BHO will deny coverage using the same guidelines. In fact, at oral argument, Defendants insist that they no longer employ the guidelines at issue in this case. In short, future disputes under the Parity Act are simply not ripe for decision, therefore, the court does not reach the issue of whether Defendants violated the Parity Act.

### III.     Remedy

### A.  *Award of Benefits*

Having determined that BHO's denial of coverage for M.M's residential treatment was arbitrary and capricious, this court may either remand the case to the plan administrator for a renewed evaluation or order an award of benefits. "Which of these two remedies is proper in a given case, however, depends on the specific flaws in the plan administrator's decision." *DeGrado*

*v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006). When a denial of benefits based on the record was clearly unreasonable, "a remand for further action is unnecessary." *Caldwell*, 287 F.3d at 1288-89. "[W]hen an ERISA administrator fails to make adequate findings or to explain adequately the grounds of her decision," the remedy "is to remand the case to the administrator for further findings or explanation." *Id.*[7]

Here, there is insufficient ground in the record to find that BHO's decisions were categorically unreasonable. The court only finds that BHO's decision to deny benefits was arbitrary and capricious because of inadequacies in its application of facts to the Plan and failure to engage with the opinions of M.M.'s treating professionals. The court is sympathetic to the argument that BHO's denials could not be supported by substantial evidence in the record, but Plaintiffs failed to sufficiently argue this proposition in their briefs—instead primarily advancing claims that BHO's *letters* were poorly reasoned. Defendants, on the other hand, maintained that their denial

---

[7] Plaintiffs dispute the proper standard for remanding a case back to the claims administrator. The court dismisses each of their arguments in turn. First, Plaintiffs state that *Rasenack* held that a claims administrator that fails to provide timely notice of its denial of benefits is "not entitled to the protections concerning administrative review" and courts should not remand their decisions. 585 F.3d at 1327. The scenario in *Rasenack*, where a defendant delayed their denial of benefits, is distinguishable from the fact pattern here, where BHO denied Plaintiffs' coverage in a timely manner. The court, thus, declines to apply the *Rasenack* carveout from the rule announced in *Caldwell*. 287 F.3d at 1288-89. Second, Plaintiffs argue that the text of ERISA "does not contain any provisions governing remands to plan administrators . . . nor does it explain how judicial review of determinations made on remand is to occur." *Mead v. Reliastar Life Ins. Co.*, 768 F.3d 102, 112 (2nd Cir. 2014). They contend that this contrasts with the regulatory framework governing administrative agencies and runs a risk of creating an unfair "heads we win; tails let's pay again," dynamic. *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004). While this line of reasoning is compelling on its face, the court cannot adopt it as its own because it is bound by Tenth Circuit precedent that clearly requires remand of cases that are not "clear cut." *Caldwell*, 287 F.3d at 1288-89. Third, Plaintiffs contend that remanding the case would violate the Article III prohibition on advisory judicial opinions. Many federal district courts have remanded ERISA cases back to a claims administrator for further review, yet no appellate court has found this practice unconstitutional. This court declines to unilaterally upend precedent by adopting Plaintiffs' novel interpretation of the Constitution.

of benefits was reasonable given the evidence on the record. They also indicated that Plaintiffs had failed to carry their burden of proof on this issue. Accordingly, the court must reverse and remand to the claims administrator.

On remand, BHO is required to reconsider its denial of benefits consistent with this decision. At a bare minimum, it must: (1) correct the identified serious procedural irregularities; (2) apply criteria to evaluate M.M.'s diagnoses, conditions, and symptoms that are consistent with the Plan's definition of RTC care; (3) assume, for the purposes of review, that Aspiro and Daniels meet all requirements to be considered RTCs; (4) offer a reasoned analysis by applying appropriate medical necessity criteria to identified facts in the record; (5) consider contrary medical evidence, including the opinions of M.M's treating professionals; and (6) clearly communicate its findings to claimants.[8]

### B. Prejudgment Interest

In an ERISA matter, "[p]rejudgment interest is . . . available in the court's discretion." *Weber*, 541 F.3d at 1016 (quotations omitted). Because the court has remanded the claims and has not reinstated benefits, the court will not award prejudgment interest. *See Michael D. v. Anthem Health Plans of Kentucky, Inc.*, 369 F. Supp. 3d 1159, 1179 (D. Utah 2019).

### C. Attorney's Fees and Costs

---

[8] Plaintiffs argue that Defendants must limit their rationale for denial on remand to those they have already articulated in their denial letters. They contend that to do otherwise would violate Tenth Circuit precedent stating that "remand is not appropriate to provide the plan administrator the opportunity to reevaluate a claim based on a rationale not raised in the administrative record." *Carlile v. Reliance Standard Life Ins. Co*., 988 F.3d 1217, 1229 (10th Cir. 2021). The court agrees with Plaintiffs' interpretation of *Carlile*. On remand, Defendants may draw facts from the record that support their previously expressed rationale for denying benefits, but they may not introduce new rationales for denial. Specifically, if Defendants choose to deny benefits, they are expressly limited to doing so using a "medical necessity" rationale.

Under 29 U.S.C. § 1132(g)(1), a court "in its discretion may allow a reasonable attorney's fee" when a "claimant has achieved 'some degree of success on the merits.'" *Cardoza v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1207 (10th Cir. 2013) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 245 (2010)). The Tenth Circuit has established five factors a court may consider in deciding whether to exercise its discretion to award attorney's fees and costs:

> (1) The degree of the opposing party's culpability or bad faith; (2) the opposing party' ability to satisfy an award of fees; (3) whether an award of fees would deter others from acting under similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

*Id*. The factors are flexible. "No single factor is dispositive and a court need not consider every factor in every case." *Id*. Concerning costs, 28 U.S.C. § 1920 sets forth the items that may be recovered as costs in an ERISA action. See *Allison v. Bank One–Denver*, 289 F.3d 1223, 1243–44 (10th Cir. 2002). The court "has no discretion to award items as costs that are not set out in section 1920." *Sorbo v. United Parcel Service*, 432 F.3d 1169, 1179 (10th Cir. 2005) (quotation omitted).

Here, all factors point towards an award of costs and fees. First, while the court has not ruled that BHO acted in bad faith by denying benefits, BHO's repeated failure to properly adjudicate Plaintiffs' claims when it owes its members a fiduciary duty favors the awarding of attorney's fees and costs. BHO has not lived up to its duty "to seek out the information necessary for a fair and accurate assessment of the claim," *Rasenack*, 287 F.3d at 1324. Second, there is no question that Defendants can satisfy an award of fees and costs. Third, the insurance industry appears to need a strong push to engage in "meaningful dialogue" with future claimants for RTC treatment in Utah.[9] "An award of fees should encourage BHO and other claims administrators to

---

[9] This is far from the first case of its type to come before the court. *See, e.g., Raymond M.,* 463 F. Supp. 3d; *David P.*, 564 F. Supp. 3d; & *Michael D.*, 369 F. Supp. 3d 1159 (D. Utah 2019).

follow ERISA's minimum procedural regulations and engage in a 'meaningful dialogue' with claimants in the future." *Raymond M.*, 463 F. Supp. 3d at 1287 (citing *Michael D.*, 369 F. Supp. 3d at 1179). Fourth, the parties sought to benefit all participants and beneficiaries of the plan with their lawsuit. Fifth, Plaintiffs have successfully shown that BHO's denial of benefits was arbitrary and capricious, supporting the relative merits of its position.

For these reasons, the court will award appropriate attorney's fees and costs to Plaintiffs for work performed as defined by 28 U.S.C. § 1920. Within twenty-one days of this order, Plaintiffs' counsel should submit a petition for attorney's fees and costs, including an affidavit indicating a calculation of fees with an accounting of time and costs.

## ORDER

For the foregoing reasons, the court DENIES Defendants' motion for summary judgment and GRANTS Plaintiffs' motion for summary judgment, in part. Specifically:

1. Defendants' motion for summary judgment on BHO's denial of benefits is DENIED.

2. Plaintiffs' motion for summary judgment on their request to remand claims for M.M.'s treatment is GRANTED.

3. Plaintiffs' motion to reverse Defendants' denial of benefits is DENIED.

4. The court does not address the parties' cross-motions for summary judgment on the Parity Act claim because this order has rendered the issue moot.

5. Plaintiffs' request for prejudgment interest on the benefits amount is DENIED.

6. Plaintiffs' request for attorney's fees and costs is GRANTED. Plaintiffs' counsel should submit its petition for fees and costs within twenty-one (21) days of this order.

DATED September 27, 2022.

BY THE COURT

Jill N. Parrish
United States District Court Judge